## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| EDDIE ALFRED, SR.<br>EDDIE ALFRED, JR.<br>BRADY ALFRED<br><br>Plaintiff,<br><br><br>v.<br><br>JOHNSON & JOHNSON, JOHNSON &<br>JOHNSON CONSUMER COMPANIES,<br>INC., IMERYS TALC AMERICA, INC.<br>F/K/A LUZENAC AMERICA, INC. and<br>PERSONAL CARE PRODUCTS COUNCIL<br>F/K/A COSMETIC, TOILETRY, AND<br>FRAGRANCE ASSOCIATION (CTFA)<br><br>Defendants. | CIVIL ACTION NO.<br><br><br>JUDGE:<br><br><br>MAGISTRATE: |

## COMPLAINT

COMES NOW Eddie Alfred, widower and heir of deceased Shirley Harris, along with Eddie Alfred, Jr. and Brady Alfred, sons of Eddie Alfred, Sr. and Shirley Alfred, by and through undersigned counsel, who bring this action against Defendants Johnson & Johnson; Johnson & Johnson Consumer Companies, Inc.; Imerys Talc America, Inc., f/k/a Luzenac America, Inc.; Personal Care Products Council f/k/a Cosmetic, Toiletry, and Fragrance Association (CTFA), and respectfully alleges the following:

## INTRODUCTION

1.      This action arises out of Decedent Shirley Alfred's death from ovarian cancer on March 30, 2016, which was directly and proximately caused by her regular and prolonged exposure to talcum powder contained in Defendant's Johnson & Johnson Baby Powder and

Shower to Shower. All claims in this action are a direct and proximate result of Defendants' and/or their corporate predecessors' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of the products known as Johnson & Johnson Baby Powder and Shower to Shower (hereinafter "the PRODUCTS"). Plaintiff seeks recovery for damages as a result of his wife developing ovarian cancer, which was directly and proximately caused by such wrongful conduct by Defendants, the unreasonably dangerous and defective nature of talcum powder, and the attendant effects of developing ovarian cancer.

## PARTIES, JURISDICTION AND VENUE

2.      Plaintiffs Eddie Alfred, Sr., Eddie Alfred, Jr. and Brady Alfred are citizens and domiciliaries of the City of Fenton in Jefferson Davis Parish, Louisiana. They are the surviving heirs of the deceased Shirley Alfred. At all pertinent times, beginning in the 1960's until her death on March 30, 2016, Shirley Alfred purchased and applied talcum powder to her person in Jefferson Davis Parish, Louisiana.  Shirley Alfred developed ovarian cancer, suffered the effects attendant thereto, and ultimately died as a direct and proximate result of the unreasonably dangerous and defective nature of talcum powder and Defendants' wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of talcum powder. As a direct and proximate result of these injuries, Jeanne Harris endured severe pain and suffering and loss of enjoyment of life in addition to other damages of a personal and pecuniary nature, and eventually suffered wrongful death. Plaintiffs sustained loss of care, comfort, and economic damages.

3.      The Defendant, Johnson & Johnson, is a New Jersey corporation with its principal place of business in the State of New Jersey.

2

4.      At all pertinent times, Johnson & Johnson was engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing the PRODUCTS. At all pertinent times, Johnson & Johnson regularly transacted, solicited, and conducted business in all States of the United States, including the State of Louisiana.

5.      The Defendant, Johnson & Johnson Consumer Companies, Inc. is a New Jersey corporation with its principal place of business in the State of New Jersey.

6.      At all pertinent times, Johnson & Johnson Consumer Companies, Inc. was engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing the PRODUCTS. At all pertinent times, Johnson & Johnson regularly transacted, solicited, and conducted business in all States of the United States, including the State of Louisiana.

7.      The Defendant, Imerys Talc America, Inc., f/k/a Luzenac America, Inc., is a Delaware corporation with its principal place of business in the State of California.

8.      At all pertinent times, Imerys Talc America, Inc., f/k/a Luzenac America, Inc., has been in the business of mining and distributing talcum powder for use in talcum powder based products, including the PRODUCTS. Imerys Talc is the successor or continuation of Luzenac America, Inc., and Imerys Talc America, Inc. is legally responsible for all liabilities incurred when it was known as Luzenac America, Inc.

9.      The Defendant, Personal Care Products Counsel ("PCPC"), f/k/a Cosmetic, Toiletry, and Fragrance Association ("CTFA"), is a corporation organized under the laws of the District of Columbia, with its principal place of business in the District of Columbia.

10.     PCPC is the successor or continuation of CTFA and PCPC is legally responsible for all liabilities incurred when it was known as CTFA.

11.     At all pertinent times, all Defendants were engaged in the research, development, manufacture, design, testing, sale and marketing of PRODUCTS, and introduced such products into interstate commerce with knowledge and intent that such products be sold in the State of Louisiana.

12.     Suit is brought under this Court's diversity jurisdiction pursuant to 28 U.S.C. 1331 et. seq. Supplemental jurisdiction is also invoked pursuant to 28 U.S.C. 1367 as to all matters cognizable under the Louisiana Constitution and the dialectal laws of the State of Louisiana, specifically including Louisiana Civil Code Articles 2315, 2315.1 and 2315.2 (wrongful death and survival); Louisiana Civil Code Articles 2520 and 2545 (redhibition); Louisiana Civil Code Articles 1953 and 1958 (fraud); Louisiana Revised Statutes 51:1401 and 51:1409 (unfair trade and consumer protection); and Louisiana Revised Statutes 9:2800 (Louisiana Products Liability Act).

13.     Venue is proper in this Court because Decedent Shirley Alfred was first exposed to talcum powder in Jefferson Davis Parish, Louisiana, as this is where, at all pertinent times, she purchased, ingested, and was exposed to the product at issue.

## ALLEGATIONS COMMON TO ALL COUNTS

14.     Talc is a magnesium trisilicate and is mined from the earth. Talc is an inorganic mineral. The Defendant, Imerys Talc America, Inc., f/k/a Luzenac America, Inc., mined the talc contained in the PRODUCTS.

15.     Talc is the main substance in talcum powders. The Johnson & Johnson Defendants manufactured the PRODUCTS. The PRODUCTS are composed almost entirely of talc.

16.     At all pertinent times, a feasible alternative to the PRODUCTS has existed. Cornstarch is an organic carbohydrate that is quickly broken down by the body with no known

health effects. Cornstarch powders have been sold and marketed for the same uses with nearly the same effectiveness.

17.     Imerys Talc[1] has continually advertised and marketed talc as safe for human use.

18.     Imerys Talc supplies customers with material safety data sheets for talc. These material safety data sheets are supposed to convey adequate health and warning information to its customers.

19.     Historically, "Johnson's Baby Powder" has been a symbol of freshness, cleanliness, and purity. During the time in question, the Johnson & Johnson Defendants advertised and marketed this product as the beacon of "freshness" and "comfort", eliminating friction on the skin, absorbing "excess wetness" helping keep skin feeling dry and comfortable, and "clinically proven gentle and mild". The Johnson & Johnson Defendants compelled women through advertisements to dust themselves with this product to mask odors. The bottle of "Johnson's Baby Powder" specifically targets women by stating, "For you, use every day to help feel soft, fresh, and comfortable."

20.     During the time in question, the Johnson & Johnson Defendants advertised and marketed the product "Shower to Shower" as safe for use by women as evidenced in its slogan "A sprinkle a day keeps odor away", and through advertisements such as "Your body perspires in more places than just under your arms. Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day." And "SHOWER to SHOWER can be used all over your body."

21.     The Decedent used the PRODUCTS to dust her perineum for feminine hygiene purposes. This was an intended and foreseeable use of the PRODUCTS based on the advertising, marketing, and labeling of the PRODUCTS.

---

[1] All allegations regarding actions taken by Imerys Talc also include actions taken while that entity was known as Luzenac America, Inc.

22.     In 1971, the first study was conducted that suggested an association between talc and ovarian cancer. This study was conducted by Dr. W. J. Henderson and others in Cardiff, Wales.

23.     In 1982, the first epidemiologic study was performed on talc powder use in the female genital area. This study was conducted by Dr. Daniel Cramer and others. This study found a 92% increased risk in ovarian cancer with women who reported genital talc use. Shortly after this study was published, Dr. Bruce Semple of Johnson & Johnson came and visited Dr. Cramer about his study. Dr. Cramer advised Dr. Semple that Johnson & Jonhson should place a warning on its talcum powders about the ovarian cancer risks so that women can make an informed decision about their health.

24.     Since 1982, there have been approximately twenty-two (22) additional epidemiologic studies providing data regarding the association of talc and ovarian cancer. Nearly all of these studies have reported an elevated risk for ovarian cancer associated with genital talc use in women.

25.     In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity. Talc was found to be a carcinogen, with or without the presence of asbestos-like fibers.

26.     In response to the United States National Toxicology Program's study, the Cosmetic Toiletry and Fragrance Association (CTFA) formed the Talc Interested Party Task Force (TIPTF). Johnson & Johnson, Inc., Johnson & Johnson Consumer Companies, Inc. and Luzenac were members of the CTFA and were the primary actors and contributors of the TIPTF. The stated purpose of the T1PTF was to pool financial resources of these companies in an effort to collectively defend talc use at all costs and to prevent regulation of any type over this industry. The TIPTF

hired scientists to perform biased research regarding the safety of talc, members of the TIPTF edited scientific reports of the scientists hired by this group prior the submission of these scientific reports to governmental agencies, members of the TIPTF knowingly released false information about the safety of talc to the consuming public, and used political and economic influence on regulatory bodies regarding talc. All of these activities have been well coordinated and planned by these companies and organizations over the past four (4) decades in an effort to prevent regulation of talc and to create confusion to the consuming public about the true hazards of talc relative to ovarian cancer.

27.     On November 10, 1994, the Cancer Prevention Coalition mailed a letter to then Johnson & Johnson C.E.0, Ralph Larson, informing his company that studies as far back as 1960's "… show [ ] conclusively that the frequent use of talcum powder in the genital area pose[ ] a serious health risk of ovarian cancer." The letter cited a recent study by Dr. Bernard Harlow from Harvard Medical School confirming this fact and quoted a portion of the study where Dr. Harlow and his colleagues discouraged the use of talc in the female genital area. The letter further stated that 14,000 women per year die from ovarian cancer and that this type of cancer is very difficult to detect and has a low survival rate. The letter concluded by requesting that Johnson & Johnson withdraw talc products from the market because of the alternative of cornstarch powders, or at a minimum, place warning information on its talc-based body powders about ovarian cancer risk they pose.

28.     In 1996, the condom industry stopped dusting condoms with talc due to the health concerns of ovarian cancer.

29.     In February of 2006, the International Association for the Research of Cancer (IARC) part of the World Health Organization published a paper whereby they classified perineal

use of talc based body powder as a "Group 2B" human carcinogen. IARC which is universally accepted as the international authority on cancer issues, concluded that studies from around the world consistently found an increased risk of ovarian cancer in women from perineal use of talc. IARC found that between 16-52% of women in the world were using talc to dust their perineum and found an increased risk of ovarian cancer in women talc users ranging from 30-60%. IARC concluded with this "Evaluation": "There is limited evidence in humans for the carcinogenicity of perineal use of talc-based body powder." By definition "Limited evidence of carcinogenicity" means "a positive association has been observed between exposure to the agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence."

30.     In approximately 2006, the Canadian government under The Hazardous Products Act and associated Controlled Products Regulations classified talc as a "D2A", "very toxic", "cancer causing" substance under its Workplace Hazardous Materials Information System (WHMIS). Asbestos is also classified as "D2A".

31.     In 2006, Imerys Talc began placing a warning on its Material Safety Data Sheets (MSDS) it provided to the Johnson & Johnson Defendants regarding the talc it sold to them to be used in the PRODUCTS. These MSDSs not only provided the warning information about the IARC classification but also included warning information regarding "States Rights to Know" and warning information about the Canadian Government's "D2A" classification of talc as well. The Defendants had a duty to know and warn about the hazards associated with the use of the PRODUCTS.

32.     The Defendants failed to inform their customers and end users of the PRODUCTS of a known catastrophic health hazard associated with the use of its products.

8

33.     In addition, the Defendants procured and disseminated false, misleading, and biased information regarding the safety of the PRODUCTS to the public and used influence over governmental and regulatory bodies regarding talc.

34.     As a direct and proximate result of the Defendants' calculated and reprehensible conduct, Decedent was injured and suffered damages, namely ovarian cancer, which required surgeries and treatments and later lead to her death. Plaintiffs have sustained loss of care, comfort, and economic damages.

### COUNT ONE — STRICT LIABILITY FOR FAILURE TO WARN
### (Imerys Talc and Johnson & Johnson Defendants)

35.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

36.     At all pertinent times, Imerys Talc mined and sold talc to the Johnson & Johnson Defendants, which it knew that Johnson & Johnson was then packaging and selling to consumers as the PRODUCTS and it knew that consumers of the PRODUCTS were using it to powder their perineal regions.

37.     At all pertinent times, Imerys Talc knew and/or should have known of the unreasonably dangerous and carcinogenic nature of the talc it was selling to the Johnson & Johnson Defendants, especially when used in a woman's perineal regions, and it knew or should have known that Johnson & Johnson was not warning its consumers of this danger.

38.     At all pertinent times, the Johnson & Johnson Defendants were manufacturing, marketing, testing, promoting, selling and/or distributing the PRODUCTS in the regular course of business.

39.     At all pertinent times, Decedent used the PRODUCTS to powder her perineal area, which is a reasonably foreseeable use.

9

40.     At all pertinent times, all Defendants in this action knew or should have known that the use of talcum powder based products in the perineal area significantly increases the risk of ovarian cancer based upon scientific knowledge dating back to the 1960s.

41.     At all pertinent times, including the time of sale and consumption, the PRODUCTS, when put to the aforementioned reasonably foreseeable use, were in an unreasonably dangerous and defective condition because they failed to contain adequate and proper warnings and/or instructions regarding the increased risk of ovarian cancer associated with the use of the PRODUCTS by women to powder their perinea, area. Defendants themselves failed to properly and adequately warn and instruct the public, including Decedent as to the risks and benefits of the PRODUCTS given the public's need for this information.

42.     Had the Decedent received a warning that the use of the PRODUCTS would have significantly increased their risk of ovarian cancer, she would not have used the same. As a proximate result of Defendants' design, manufacture, marketing, sale, and distribution of the PRODUCTS, Decedent was injured catastrophically, and has been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life and wrongful death. Plaintiffs have sustained loss of care, comfort, and economic damages.

43.     The development of ovarian cancer by the Decedent was the direct and proximate result of the unreasonably dangerous and defective condition of the PRODUCTS at the time of sale and consumption, including their lack of warnings; Decedent suffered injuries and damages including but not limited to conscious pain and suffering, medical expenses and lost wages and wrongful death. Plaintiffs have suffered loss of care, comfort and economic damages.

44.     The Defendants' products were defective because they failed to contain warnings and/or instructions, and breached express warranties and/or failed to conform to express factual

representations upon which the Decedent justifiably relied in electing to use the products. The defect or defects made the products unreasonably dangerous to those persons, such as Decedent, who could reasonably be expected to use and rely upon such products. As a result, the defect or defects were a producing cause of the Decedent's injuries and damages.

45.     The Defendants' products failed to contain, and continue to this day not to contain, adequate warnings and/or instructions regarding the increased risk of ovarian cancer with the use of their products by women. The Defendants continue to market, advertise, and expressly represent to the general public that it is safe for women to use their product regardless of application. These Defendants continue with these marketing and advertising campaigns despite having scientific knowledge that dates back to the 1960's that their products increase the risk of ovarian cancer in women when used in the perineal area.

## COUNT TWO — NEGLIGENCE
### (Imerys Talc)

46.     Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully and completely herein.

47.     At all pertinent times, Defendants had a duty to exercise reasonable care to consumers, including Decedent herein, in the design, development, manufacture, testing, inspection, packaging, promotion, marketing, distribution, labeling and/or sale of the PRODUCTS.

48.     At all pertinent times, Imerys Talc mined and sold talc to the Johnson & Johnson Defendants, which it knew and/or should have known was then being packaged and sold to consumers as the PRODUCTS by the Johnson and Johnson Defendants. Further, Imerys Talc knew and/or should have known that consumers of the PRODUCTS were using it to powder their perineal regions.

49.     At all pertinent times, Imerys Talc knew or should have known that the use of talcum powder based products in the perineal area significantly increases the risk of ovarian cancer based upon scientific knowledge dating back to the 1960s.

50.     At all pertinent times, Imerys Talc knew or should have known that Johnson & Johnson was not providing warnings to consumers of the PRODUCTS of the risk of ovarian cancer posed by talc contained therein.

51.     At all pertinent times, Imerys Talc was negligent in providing talc to the Johnson & Johnson Defendants, when it knew or should have known that the talc would be used in the PRODUCTS, without adequately taking steps to ensure that ultimate consumers of the PRODUCTS, including Decedent, received the information that Imerys Talc possessed on the carcinogenic properties of talc, including its risk of causing ovarian cancer.

52.     As a direct and proximate result of Imerys Talc's negligence, Decedent purchased and used, as aforesaid, the PRODUCTS that directly and proximately caused Decedent to develop ovarian cancer; Decedent was caused to incur medical bills, lost wages, conscious pain and suffering and death.  Plaintiffs were caused to sustain loss of care and comfort and economic damages as a direct and proximate result.

### COUNT THREE —NEGLIGENCE
#### (Johnson & Johnson Defendants)

53.     Plaintiffs hereby incorporate by reference each of the preceding paragraphs as if fully set forth herein.

54.     The Johnson & Johnson Defendants were negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing the PRODUCTS in one or more of the following respects:

- In failing to warn Decedent of the hazards associated with the use of the PRODUCTS;

- In failing to properly test their products to determine adequacy and effectiveness or safety measures, if any, prior to releasing the PRODUCTS for consumer use;

- In failing to properly test their products to determine the increased risk of ovarian cancer during the normal and/or intended use of the PRODUCTS;

- In failing to inform ultimate users, such as Decedent as to the safe and proper methods of handling and using the PRODUCTS;

- In failing to remove the PRODUCTS from the market when the Defendants knew or should have known the PRODUCTS were defective;

- In failing to instruct the ultimate users, such as Decedent, as to the methods for reducing the type of exposure to the PRODUCTS which caused increased risk of ovarian cancer;

- In failing to inform the public in general and the Decedent in particular of the known dangers of using the PRODUCTS for dusting the perineum;

- In failing to advise users how to prevent or reduce exposure that caused increased risk for ovarian cancer;

- In marketing and labeling the PRODUCTS as safe for all uses despite knowledge to the contrary;

- In failing to act like a reasonably prudent company under similar circumstances.

Each and all of these acts and omissions, taken singularly or in combination, were a proximate cause of the injuries and damages sustained by Decedent and Plaintiffs.

55.     At all pertinent times, the Johnson & Johnson Defendants knew or should have known that the PRODUCTS were unreasonably dangerous and defective when put to their reasonably anticipated use.

56.     As a direct and proximate result of the Johnson & Johnson Defendants' negligence in one or more of the aforementioned ways, Decedent purchased and used, as aforesaid, the PRODUCTS that directly and proximately caused Decedent to develop ovarian cancer;

13

Decedent was caused to incur medical bills, lost wages, and conscious pain and suffering and wrongful death. Plaintiffs were caused to suffer loss of care and comfort and economic damages.

## COUNT FOUR — BREACH OF EXPRESS WARRANTY
### (Johnson & Johnson Defendants)

57.     Plaintiffs hereby incorporate by reference each of the preceding paragraphs as if fully set forth herein.

58.     The Johnson & Johnson Defendants expressly warranted, through direct-to-consumer marketing, advertisements, and labels, that the PRODUCTS were safe and effective for reasonably anticipated uses, including use by women in the perineal area.

59.     The PRODUCTS did not conform to these express representations because they cause serious injury when used by women in the perineal area in the form of ovarian cancer.

60.     As a direct and proximate result of the Defendants' breach of warranty, Decedent purchased and used, as aforesaid, the PRODUCTS that directly and proximately caused each woman to develop ovarian cancer; Decedent was caused to incur medical bills, lost wages, and conscious pain and suffering. Plaintiffs were caused to suffer loss of care and comfort and economic damages.

## COUNT FIVE — BREACH OF IMPLIED WARRANTIES
### (Johnson & Johnson Defendants)

61.     Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

62.     At the time the Defendants manufactured, marketed, labeled, promoted, distributed and/or sold the PRODUCTS, the Johnson & Johnson Defendants knew of the uses for which the PRODUCTS were intended, including use by women in the perineal area, and impliedly warranted the PRODUCTS to be of merchantable quality and safe for such use.

63.     Defendants breached their implied warranties of the PRODUCTS sold to Decedent because they were not fit for their common, ordinary and intended uses, including use by women in the perineal area.

64.     As a direct, foreseeable and proximate result of the Defendants' breaches of implied warranties, Decedent purchased and used, as aforesaid, the PRODUCTS that directly and proximately caused Decedent to develop ovarian cancer; Decedent was caused to incur medical bills, lost wages, and conscious pain and suffering and death. Plaintiffs were caused to suffer loss of care and comfort and economic damages.

## COUNT SIX — CIVIL CONSPIRACY
### (All Defendants)

65.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

66.     Defendants and/or their predecessors-in-interest knowingly agreed, contrived, combined, confederated and conspired among themselves to cause Decedent's injuries, disease, and death by exposing the Decedent to harmful and dangerous PRODUCTS. Defendants further knowingly agreed, contrived, confederated and conspired to deprive the Decedent of the opportunity of informed free choice as to whether to use the PRODUCTS or to expose her to said dangers. Defendants committed the above described wrongs by willfully misrepresenting and suppressing the truth as to the risks and dangers associated with the use of and exposure to the PRODUCTS.

67.     In furtherance of said conspiracies, Defendants performed the following overt acts:

a.      For many decades, Defendants, individually, jointly, and in conspiracy with each other, have been in possession of medical and scientific data, literature and test reports which clearly indicated that use of their by women resulting from ordinary and foreseeable use of the PRODUCTS were unreasonably dangerous, hazardous, deleterious to human health, carcinogenic, and potentially deadly;

b.      Despite the medical and scientific data, literature, and test reports possessed by and available to Defendants, Defendants individually, jointly, and in conspiracy with each other, fraudulently, willfully and maliciously:

      i.      Withheld, concealed and suppressed said medical information regarding the increased risk of ovarian cancer from Decedent  (as set out in the "Facts" section of this pleading); In addition, on July 27, 2005 Defendants as part of the TIPTF corresponded and agreed to edit and delete portions of scientific papers being submitted on their behalf to the United States Toxicology Program in an attempt to prevent talc from being classified as a carcinogen;

      ii.     The Defendants through the TIPTF instituted a "defense strategy" to defend talc at all costs. Admittedly, the Defendants through the TIPTF used their influence over the NTP Subcommittee, and the threat of litigation against the NTP to prevent the NTP from classifying talc as a carcinogen on its 10th RoC. According to the Defendants, ". . we believe these strategies paid-off";

      iii.    Caused to be released, published and disseminated medical and scientific data, literature, and test reports containing information and statements regarding the risks of ovarian cancer which Defendants knew were incorrect, incomplete, outdated, and misleading.          Specifically,         the Defendants through the TIPTF collectively agreed to release false information to the public regarding the safety of talc on July 1, 1992; July 8, 1992; and November 17, 1994. In a letter dated September 17, 1997, the Defendants were criticized by their own Toxicologist consultant for releasing this false information to the public, yet nothing was done by the Defendants to correct or redact this public release of knowingly false information.

c.      By these false and fraudulent representations, omissions, and concealments, Defendants intended to induce the Decedent to rely upon said false and fraudulent representations, omissions and concealments, and to continue to expose herself to the dangers inherent in the use of and exposure to the PRODUCTS.

68.     Decedent reasonably and in good faith relied upon the aforementioned fraudulent representations, omissions, and concealments made by Defendants regarding the nature of the PRODUCTS.

69.     As a direct, foreseeable and proximate result of the Defendants' breaches of implied warranties, Decedent purchased and used, as aforesaid, the PRODUCTS that directly

and proximately caused Decedent to develop ovarian cancer; Decedent was caused to incur medical bills, lost wages, conscious pain and suffering and death. Plaintiffs were caused to suffer loss of care and comfort and economic damages.

### COUNT SEVEN — CONCERT OF ACTION
### (All Defendants)

70.     Plaintiffs hereby incorporate by reference each of the preceding paragraphs as if fully set forth herein.

71.     At all pertinent times, Imerys Talc, the Johnson & Johnson Defendants, and the PCPC knew that the PRODUCTS should contain warnings on the risk of ovarian cancer posed by women using the product to powder the perinea' region, but purposefully sought to suppress such information and omit warnings from talc based products so as not to negatively affect sales and maintain the profits of the Johnson & Johnson Defendants, Imerys Talc, and the members of the PCPC.

72.     As a direct, foreseeable and proximate result of the Defendants' breaches of implied warranties, Decedent purchased and used, as aforesaid, the PRODUCTS that directly and proximately caused Decedent to develop ovarian cancer; Decedent was caused to incur medical bills, lost wages, conscious pain and suffering and death. Plaintiffs were caused to suffer loss of care and comfort and economic damages.

### COUNT EIGHT — CONCERT OF ACTION
### (Defendant Personal Care Products Council)

73.     Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint as if set forth at length herein.

74.     Upon information and belief, Defendant Personal Care Products Council f/k/a Cosmetic, Toiletries, and Fragrance Council knowingly and willfully aided and abetted the fraudulent marketing and sales described herein.

75.     Defendant PCPC aided and abetted this fraudulent scheme by providing substantial assistance to Defendants, Imerys and Johnson & Johnson. This substantial assistance included, among other things, the "Facts" section of this pleading and the facts set forth in Paragraph 125.

76.     Without Defendant PCPC's substantial assistance, involvement and participation; the fraudulent scheme would not have been possible.

77.     Decedent suffered serious injury, pecuniary losses and then death as a proximate result of the aiding and abetting of Defendant PCPC, including but not limited to the loss of the Decedent's' life. Plaintiffs were caused to suffer loss of care and comfort and economic damages.

## COUNT NINE — NEGLIGENT MISREPRESENTATION
### (All Defendants)

78.     Plaintiffs reallege each and every allegation of this Complaint as if each were set forth fully and completely herein.

79.     Defendants had a duty to accurately and truthfully represent to the medical and healthcare community, Decedent and the public, that the PRODUCTS had been tested and found to be safe and effective for use in the perineal area. The representations made by Defendants, in fact, were false.

80.     Defendants failed to exercise ordinary care in the representations concerning the PRODUCTS while they were involved in their manufacture, sale, testing, quality assurance, quality control, and distribution in interstate commerce, because Defendants negligently misrepresented the PRODUCTS' high risk of unreasonable, dangerous, adverse side effects.

18

81.     Defendants breached their duty in representing that the PRODUCTS have no serious side effects.

82.     As a foreseeable, direct and proximate result of the negligent misrepresentation of Defendants as set forth herein, Defendants knew, and had reason to know, that the PRODUCTS had been insufficiently tested, or had not been tested at all, and that they lacked adequate and accurate warnings, and that it created a high risk, and/or higher than acceptable risk, and/or higher than reported and represented risk, of adverse side effects.

83.     As a proximate result of Defendants' conduct, Decedent was been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life and eventual death. Plaintiffs suffered loss of care and comfort, and economic damages.

## COUNT TEN – FRAUD
### (All Defendants)

84.     Plaintiffs reallege each and every allegation of this Complaint as if each were set forth fully and completely herein.

85.     At all pertinent times, Imerys Talc, the Johnson & Johnson Defendants, and the PCPC knew that the PRODUCTS should contain warnings on the risk of ovarian cancer posed by women using the product to powder the perinea' region, but purposefully sought to suppress such information and omit from talc based products so as not to negatively affect sales and maintain the profits of the Johnson & Johnson Defendants, Imerys Talc, and the members of the PCPC.

86.     Defendants' fraudulent conduct, which continues to this day, violates Louisiana Civil Code Article 1953, which states that "Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction."

19

87.     Decedent reasonably and in good faith relied upon the aforementioned fraudulent representations, omissions, and concealments made by Defendants regarding the nature of the PRODUCTS.

88.     As a proximate result of Defendants' fraudulent conduct, Decedent suffered injury and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, and eventual death. Plaintiff suffered loss of care and comfort, and economic damages.

89.     As a result of Defendants' fraudulent conduct, Plaintiffs specifically demand damages and attorney fees pursuant to Louisiana Civil Code Article 1958.

## COUNT ELEVEN – LOUISIANA PRODUCTS LIABILITY ACT
### (Johnson & Johnson Defendants)

90.     Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

91.     At all times material to this action, Defendants were engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling the Products.

92.     At all times pertinent hereto, the Products were expected to reach, and did reach, consumers in the State of Louisiana and throughout the United States,  including Plaintiff herein, without substantial change in the condition in which they were sold.

93.     At all times material hereto, the Products were designed, developed, marketed, manufactured, tested, packaged, promoted, marketed, labeled, and/or sold by Defendants in a defective and unreasonably dangerous condition at the time they were placed in the stream of commerce in the following non-exclusive particulars:

a.      When placed in the stream of commerce, the Products contained

manufacturing and design defects which rendered the Products unreasonably

dangerous;

b.      The Products' manufacturing and design defects occurred while the

Products were in the sole possession and control of Defendants;

c.      The Products' manufacturing and design defects existed before they left

the control of the Defendants.

94.      The Products manufactured and/or designed by Defendants were defective in

construction or composition in that, when they left the hands of Defendants, they deviated in a

material way from Defendants' manufacturing performance standards and/or differed from

otherwise identical products manufactured in the same design formula. In particular, the Products

are not safe, have numerous and serious side effects and pose severe and sometime fatal harm.

The Products are unreasonably dangerous in construction and/or composition as provided by La.

R.S. 9:2800.55.

95.      The Products manufactured and/or designed by Defendants were defective in

design in that an alternative design exists that would prevent serious side effects and severe and

permanent harm. For example, cornstarch is an organic carbohydrate that is quickly broken down

by the body with no unknown health effects. Cornstarch based powders have been sold and

marketed for the same uses as the Products with substantially the same effectiveness. The

Products are unreasonably dangerous in design as defined in La. R.S. 9:2800.56.

96.      The Products manufactured and/or supplied by Defendants were unreasonably

dangerous because Defendants did not provide adequate warnings about them. At the time the

Products left Defendants' control, they possessed a characteristic that may cause damage, and the

Defendants failed to use reasonable care to provide an adequate warning of the dangerous characteristic and its danger to users and handlers of the Products. The Products are not safe and have numerous and serious side effects including, but not limited to, causing ovarian and uterine cancers. The Products are unreasonably dangerous because of inadequate warning as provided by La. R.S. 9:2800.57

97.     The Products manufactured and/or designed by Defendants were unreasonably dangerous because they did not conform to an express warranty made by Defendants regarding the Products' safety and fitness for use. Defendants' express warranty regarding the Products induced Plaintiff to use the Products, and Decedent's and Plaintiffs' harm was proximately caused because Defendants' express warranty was untrue. The Products are unreasonably dangerous because of nonconformity to express warranty as provided by La. R.S. 9:2800.58.

98.     Plaintiffs specifically demand damages general and special damages pursuant to La. R.S. 9:2800.51 et. seq.

## COUNT TWELVE – REDHIBITION
### (Johnson & Johnson Defendants)

99.     Plaintiffs reallege each and every allegation of this Complaint as if each were set forth fully herein.

100.    At all pertinent times, including the time of sale and consumption, the PRODUCTS, when put to their intended or reasonably foreseeable use, were in an unreasonably dangerous and defective condition because they failed to contain adequate and proper warnings and/or instructions regarding the increased risk of ovarian cancer associated with the use of the PRODUCTS by women to powder their perineal area.

101.    The unreasonably dangerous nature of the PRODUCTS creates a breach of the warranty against redhibitory defects, or vices, of things sold pursuant to Louisiana Civil Code

Article 2520, which states: "A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect."

102.   Had the Decedent known that the use of the PRODUCTS would have significantly increased their risk of ovarian cancer, she would not have used the same. As a direct and proximate result of the redhibitory vices of the PRODUCTS, Decedent was injured catastrophically, and has been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life and wrongful death. Plaintiffs suffered loss of care, comfort, and economic damages.

103.   Due to the redhibitory vices of the PRODUCTS, Plaintiffs specifically demand damages and attorney fees pursuant to Louisiana Civil Code Article 2545.

## COUNT THIRTEEN – UNFAIR AND DECEPTIVE TRADE PRACTICES
### (All Defendants)

104.   Plaintiffs reallege each and every allegation of this Complaint as if each were set forth fully herein.

105.   Defendants and/or their predecessors-in-interest knowingly agreed, contrived, combined, confederated and conspired among themselves to cause Decedent's injuries, disease, and death by exposing the Decedent to harmful and dangerous PRODUCTS. Defendants further knowingly agreed, contrived, confederated and conspired to deprive the Decedent of the opportunity of informed free choice as to whether to use the PRODUCTS or to expose her to said dangers. Defendants committed the above described wrongs by willfully misrepresenting and suppressing the truth as to the risks and dangers associated with the use of and exposure to the PRODUCTS.

106.     At all pertinent times, Imerys Talc, the Johnson & Johnson Defendants, and the PCPC knew that the PRODUCTS should contain warnings on the risk of ovarian cancer posed by women using the product to powder the perineal region, but purposefully sought to suppress such information and omit warnings from talc based products so as not to negatively affect sales and maintain the profits of the Johnson & Johnson Defendants, Imerys Talc, and the members of the PCPC.

107.     The actions of Defendants violate Louisiana Revised Statutes 51:1405, which prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

108.     Because of the unfair and deceptive practices knowingly used by the Defendants, Plaintiffs specifically demand treble damages pursuant to Louisiana Revised Statute 51:1409.

## TOLLING OF PRESCRIPTION

109.     Plaintiffs reallege each and every allegation of this Complaint as if each were set forth fully herein.

110.     Decedent suffered and died from an illness that has a latency period and does not arise until many years after exposure. Decedent's tortious injury did not distinctly manifest itself until she was made aware that Decedent's ovarian cancer could be caused by her use of the Defendants' products. Consequently, the discovery rule applies to this case and prescription has been tolled until the day that Plaintiffs knew or had reason to know that Decedent's ovarian cancer was linked to Decedent's use of the Defendants' products.

111.     Furthermore, the running of any prescription period or statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and conduct. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the true risks associated with PRODUCTS.

112.    As a result of Defendants' actions, Decedent and her prescribing physicians were unaware, and could not reasonably know or have learned through reasonable diligence that Decedent had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

113.    Because Defendants failed in their duty to notify Decedent, health care professionals and the general consuming public that their PRODUCTS were defective and, further, actively attempted to conceal this fact, Defendants should be estopped from asserting defenses based on statutes of limitation or repose. The doctrine of *contra non valentem agere nulla currit praescriptio* prevents the running of liberative prescription when the cause of action is not known or reasonably knowable by the plaintiff. *Cole v. Celotex Corp.,* 620 So.2d 1154, 1156 (La.1993). There are four instances recognized by the Louisiana Supreme Court where *contra non valentum* is applied to prevent the running of prescription: (1) where there is some legal cause which prevented the courts or their officials from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; or (4) where the cause of action is neither known nor reasonably knowable by the plaintiff even though this ignorance is not induced by the defendant.  Plaintiff asserts that the third category of *contra non valentum* applies in this case due to the misrepresentations and omissions by defendants, described supra.  The third category of *contra non valentum* applies when the defendant has done some act effectually to lull the victim into inaction and prevent him or her from availing himself of their cause of action.  When, as here, the defendants engaged in

concealment, misrepresentation, fraud, and ill practices, prescription is suspended until plaintiff was made aware of the link between the use of Talc and cancer.

114.    Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing and promoting profitable PRODUCTS, notwithstanding the known or reasonably known risks. Decedent and her medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and were forced to rely on Defendants' representations.

115.    Plaintiff demands trial by jury.

WHEREFORE, Plaintiff demands judgment against all Defendants, individually, jointly, severally and in solido and  requests compensatory and statutory damages,  together with prejudgment interest, postjudgment interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

Respectfully submitted,

MORRIS BART, LLC

By:      s/*Richard L. Root*
Richard L. Root, #19988
Betsy J. Barnes, # 19473
Pan American Life Center
601 Poydras St., 24th Floor
New Orleans, LA 70130
504-525-8000 telephone
504-599-3392 facsimile
bbarnes@morrisbart.com
rroot@morrisbart.com

*Attorneys for Plaintiffs*

26